FILED

Jun 02 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

# CRIMINAL DUTY COVER SHEET
## For Northern District of California Magistrate Judges

**Target (Def. Name, Phone No., Address, etc.):** Scott Wilson

**Judge:** Ryu     **Date:** 05/27/2020     **Time Dropped Off:** _____ AM / PM

**Type and Number of Document(s):**          3-20-70695 MAG

☑ Arrest Warrant(s) (#__1__)                    ☐ Search Warrant(s) (#_____)

☐ Search Warrant Extension(s) (#_____)         ☐ Pen Register(s)/Trap & Trace(s) (#_____)

☐ Pen Register/Trap & Trace Extension(s) (#_____)   ☐ Stored Communications Act/Toll Record(s) (#_____)

☐ Non-Disclosure Order(s) (#_____)             ☐ Pole camera(s) (#_____)

☐ Summons(es) (#_____)   ☑ Other Complaint _____ (#__1__)

---

**Complete all applicable information; check box for who will pick up completed document:**
*If documents will be picked up by different people, please use separate cover sheets.*

☐ AUSA: Benjamin Kingsley

   Office Telephone Number: (415) 436-6937    Mobile Number: (415) 305-1885

   Duty AUSA Name/Number: _____
   *Include if AUSA assigned to case is not available today.*

☐ Agent: Steven Coffin

   Office Telephone Number: _____    Mobile Number: (415) 850-6104

☑ Paralegal/Other: Kathy Tat - Legal Assistant

   Telephone Number: (415) 436-6999

---

**Date and time arrest or search is planned, if applicable:** _____

**When document is needed:**
*Please do not write "ASAP." Provide specific deadline and explanation, or write "not urgent."*

Not Urgent

**Is SEALING requested?** YES     **Is this a DELAYED NOTICE warrant?** No
**Is this a RESUBMISSION?** No     **For resubmissions, previous judge's initials:** _____

---

**Judge's Remarks:**                    *(preparer should not write in this area)*

☐ Contact affiant to come in. | ☐ Signed, call to pick up. | ☐ Denied. | ☐ Other:

                              Date/Time out: _____ AM / PM

AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Northern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| Scott A. Wilson | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ December 5, 2015 _____ in the county of _____ Alameda _____ in the

_____ Northern _____ District of _____ California _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1341, 2 | Mail Fraud and Aiding and Abetting |
| 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c) | Forfeiture |

This criminal complaint is based on these facts:

See Affidavit and Attachments.

☑ Continued on the attached sheet.

_____
/s/

*Complainant's signature*

FBI Special Agent Steven C. Coffin

*Printed name and title*

Sworn to ~~before me and signed in my presence~~. over the telephone per Rule 4.1

Date: _____ May 27, 2020 _____

City and state: _____ San Francisco, XXXXXXX California _____

_____
*Judge's signature*

Thomas S. Hixson
~~Donna M. Ryu~~, U.S. Magistrate Judge
XXXXXXXXX

*Printed name and title*

<u>AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT FOR VIOLATIONS OF
18 U.S.C. § 1341, 18 U.S.C. § 981(a)(1)(C), AND 28 U.S.C. § 2461(c)</u>

I, STEVEN C. COFFIN, being duly sworn, state as follows:

## I.      **INTRODUCTION**

1.   This Affidavit is submitted in support of a Criminal Complaint against Scott A. Wilson

("WILSON") for violating 18 U.S.C. § 1341 (mail fraud), as well as 18 U.S.C. § 981(a)(1)(C)

and 28 U.S.C. § 2461(c) (forfeiture).  The victim of the fraud was WILSON's employer,

Operating Engineers Local Union No. 3 ("OE3"), which is headquartered in Alameda,

California, in the Northern District of California.

2.   Specifically, as set forth below, between November 2011 and September 2017, WILSON

schemed to defraud OE3 by misusing his position of trust to have OE3 make payments to a

company secretly owned by WILSON, and to companies owned by WILSON's friends and

relatives who then kicked back funds to him.  In total, WILSON fraudulently directed

approximately $4.5 million to these companies.  Of that amount, approximately $2.5 million was

kicked back to him in various ways.

## II.     **AGENT BACKGROUND**

3.   I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so

employed since June 21, 1998.  For most of that time, I have investigated financial crimes based

out of the FBI's San Francisco Field Office.  In this capacity, I have received advanced training

from the FBI and have investigated a wide variety of fraudulent schemes.

4.   Before joining the FBI, I served over four years as an officer in the United States Air

Force.  I was a Judge Advocate (military lawyer) and acted, at different times, as a prosecutor

and a defense attorney.  I have a Juris Doctorate from the University of Virginia.

5.   In this investigation, the FBI has worked with agents from the United States Department

of Labor ("DOL").  These agents represent DOL's Office of Inspector General ("OIG") and

Office of Labor Management Standards ("OLMS").  A forensic accountant with the FBI has also

assisted with the investigation.

6.   The facts set forth in this affidavit are based on my personal knowledge, training and

experience, knowledge obtained during my participation in this investigation and from other

agents, analysts and witnesses and from my review of documents, databases and computer

records.

7.   Unless otherwise noted, wherever in this Affidavit I recount a statement, including

written statements made by another person, that statement is recounted in substance and in

relevant part.

8.   This affidavit is intended to show merely that there is sufficient probable cause for the

requested warrant and does not set forth all of my knowledge about this matter.

### III.    FACTUAL BACKGROUND

9.   OE3 is one of the largest construction trades local unions in the United States,

representing over 35,000 workers across California, Hawaii, Nevada, and Utah.  Its members

include heavy machine operators, mechanics, surveyors, police officers, highway maintenance

operators, and other private and public employees.  The headquarters of OE3 is located in

Alameda, California.

10.  OE3's policies prohibit nepotism.  The relevant policy stated, "Directors [such as

WILSON] . . . may not hire or appoint any individual who is a near relative of any current

employee of Local Union No. 3 . . . nor contract for services from any near relative."  The policy

defined "near relative" to include spouses, children, and other close relatives of the union

employee.  This policy was in effect during the entirety of the scheme.

11. In 2002, OE3 hired WILSON as a member of its Information Technology ("IT") staff.  In August 2011, OE3 promoted WILSON to be IT Director.  In that role, WILSON was entrusted with authority to purchase goods and services for the IT department, including computer equipment, software, and consulting services.

12. In November 2011, WILSON formed Office Solution Technologies, LLC ("OST") under the laws of Wyoming.  In April 2014, WILSON filed a Statement of Information for OST with the California Secretary of State.  WILSON signed the document and listed himself as the lone Manager of the company.

13. A long-time friend of WILSON resides in South Carolina.  This cooperating witness ("CW-1") incorporated RAMY Enterprises, LLC ("RAMY") in North Carolina in July 2013.  CW-1 created RAMY at WILSON's direction.

14. A relative of WILSON resides in San Jose, California.  This cooperating witness ("CW-2) began doing business as Technical Solutions in January 2014.  CW-2 created Technical Solutions at WILSON's direction.

## IV.    IMPLEMENTATION OF THE SCHEME

- OVERVIEW

15.  In 2012, WILSON, through OST, began invoicing OE3 for goods and services.  In emails between OST and OE3, I have seen WILSON use the alias "John Lasson" when doing business as OST.  Typically, WILSON as IT Director would authorize the purchase of equipment, and one of his IT staff would contact "Lasson"/WILSON by email and place an order for the equipment.

16.  I have also reviewed emails and invoices for services and software that were never provided to OE3.  As detailed below, WILSON would authorize an expenditure from OE3, in

3

which OST was to serve as a broker, but the money stayed with OST and no services or software were provided.

17. Beginning in 2013, WILSON began to further insulate himself from discovery by using RAMY and Technical Solutions to interact with the OE3 IT staff. The scope of the business between OE3 and the two vendors increased to include managing IT projects out-sourced from OE3's IT department, at WILSON's instruction. RAMY and Technical Solutions passed on payments from OE3 to OST or to WILSON personally.

18. WILSON managed to conduct his scheme without discovery by independent auditors or OE3 until 2017. In September 2017, OE3's Finance staff discovered OST was registered to WILSON. OE3 fired WILSON. WILSON and his spouse subsequently filed for bankruptcy protection in the Northern District of Texas where he had purchased a real property with the proceeds of his wire fraud scheme, and OE3 brought a civil action in the US District Court for the Northern District of California. In hearings and depositions in the bankruptcy proceedings, WILSON falsely claimed OST was controlled and operated by unidentified "thugs" who forced him to cooperate under duress.

- OST OPERATIONS

19. I have reviewed online records of the Wyoming Secretary of State showing OST was incorporated on November 23, 2011. I am aware from experience that businesses formed in Wyoming do not list their owners/managers, but only their registered agents. In this case, the online records show the registered agent was Corporate Agents, Inc., which is a Wyoming-based company providing incorporation services.

20. I subsequently reviewed records provided by Corporate Agents, Inc., for OST. Their records showed that WILSON hired them to file incorporation documents for OST in Wyoming.

Furthermore, their records showed WILSON instructed them to forward any incoming OST mail to WILSON's home address – then in Tracy, California.

21. California law requires out-of-state companies doing business in California to register with the Secretary of State.  WILSON filed a Statement of Information for OST on April 22, 2014.  On the form, which WILSON signed, he listed himself as the sole manager of the company.  He listed one of his subordinates at OE3 on the document as OST's agent for service of process.

22. OE3 provided records of its transactions with OST.  Their accounting files showed an internal "Requestor" for each payment of an OST invoice.  The listed "Requestor" was WILSON, as IT Director, for every transaction I reviewed.  I have also reviewed emails from OE3's internal network in which WILSON instructed his subordinates to process invoices from OST.

23. An internal OE3 email also showed WILSON informing one of his staff that OST could be contacted using the email address ostmain@gmail.com.  OE3 provided me with an email, apparently forwarded by WILSON to his OE3 email address, in which WILSON used the ostmain@gmail.com address as his own and linked it to his physical home address.

24. The union's accounting records showed OE3 typically paid by check mailed to OST's Wyoming address.  According to bank records reviewed by the FBI forensic accountant, OE3's funds were deposited into a Wells Fargo bank account opened and controlled by WILSON.

25. I have reviewed records for certain OE3-OST transactions, including billing invoices from OST to OE3 for these transactions.  The invoices describe the work that OST was supposed to do for OE3.  These transactions involved payments from OE3 to OST.  According to the invoices and other records, these payments were purportedly for OST to procure mainframe

services from Unisys, to buy anti-virus software from Microsoft, Inc. ("Microsoft"), to obtain virtual machine software from VMware, Inc. ("VMware"), and to hire OST itself for consulting work related to testing servers.  As described below, in each case, WILSON defrauded his employer by failing to deliver what OE3 purchased.

26. I reviewed records provided by Unisys Corporation ("Unisys"), Microsoft, Inc., and VMware, Inc.  None of these companies had any record of receiving funds from OST on behalf of OE3.

27. On April 29, 2019, I interviewed an individual identified by the initials "D.H.".  D.H. has been employed as a network engineer at OE3 for over twelve years, and was hired by and worked under WILSON.  When D.H. needed new equipment, he would make a request to WILSON, who would respond with statements such as "let me call my guy."  The equipment provided by WILSON's purported vendor was often second-hand and outdated, which irked the staff.  D.H. also discussed the transactions noted above.  He told me:

    a.  OE3 never installed or used anti-virus software from Microsoft.  OE3 used a different anti-virus software vendor.

    b.  The invoice for OST consulting work indicated it was for testing OE3's server as part of disaster planning.  The disaster plan "fire drill" test never happened.

    c.  D.H. noted the VMware invoices were for the purchase of its version 5 software. D.H. and others on the IT staff asked WILSON for this version 5 program. WILSON told them it was "not in the budget" and required his staff to use a limited free version.  It appears from the invoices that WILSON nonetheless authorized payment to OST for this exact software, which was never delivered.

28.  Based on the information above, there is probable cause to believe that WILSON

secretly owned and operated OST, and he used the shell company and his position of trust to

defraud his employer by charging it, via OST, for goods and services never delivered.   There is

also probable cause to believe that WILSON used the proceeds of this fraud to purchase a real

property in Texas for the benefit of himself and his family, namely, the real property commonly

known as 2214 Lakeview Landing, Corsicana, Texas 75109, APN T00770805290000000.

29. By mid-2013, WILSON ended direct billing of OE3 by OST.  The scheme merely

evolved, however, with using new vendors to step in between OE3 and OST.  As described

below, the new vendors – created at WILSON's urging by CW-1 and CW-2 – would continue to

pay OST.

30. According to OE3's billing records, OE3 directly paid OST just over $170,000 in 2012-

2013.  In comparison, between October 2013 and September 2017, RAMY and Technical

Solutions paid over $1,563,000 to OST at WILSON's direction.

- RAMY OPERATIONS

31.   Through review of online state records, I found RAMY was incorporated in North

Carolina on July 18, 2013.  RAMY was re-registered on July 12, 2016 in South Carolina.  The

incorporation documents for both iterations of RAMY listed the registered agent as CW-1.

32. The FBI forensic accountant reviewed the bank statements for RAMY and informed me

that RAMY received $1,599,247 from OE3 from 2013 to 2018.  The vast majority of RAMY's

income was attributed to checks from OE3.

33. The FBI forensic accountant found RAMY transferred the majority of the proceeds to

OST – approximately $978,000.  Most of the remaining funds also enriched WILSON and his

family in other ways.  Specifically, checks totaling $414,779 were issued from RAMY directly

to WILSON's spouse and children.  CW-1 transferred approximately $58,000 to his personal

bank account, and most of the remaining funds were used to pay taxes.

34. I participated in the interview of CW-1 on April 9, 2019, pursuant to a proffer agreement. Based on the information provided by CW-1, I believe WILSON misled his friend and encouraged him to become an unwitting participant in WILSON's scheme.

35. CW-1 stated that he is currently an employee of a large national bank and resides in South Carolina.  He has been a good friend of WILSON since they attended high school together.  In late 2012, while they were watching a game, WILSON brought up the idea of CW-1 making money as a vendor for OE3.  In early 2013, WILSON raised the topic again, saying WILSON needed to find a middleman between OE3 and OST.  WILSON explained OST was a reliable parts supplier, but WILSON claimed that OST was seen as politically hostile to unions so OE3 could not continue to directly do business with them.  WILSON acted as if OST was a third-party company and never divulged to CW-1 his control of OST.

36. WILSON proposed CW-1 become a vendor and sell OST's equipment to OE3 at a mark-up.  WILSON said he was recruiting others to also become middlemen between OE3 and OST.  CW-1 asked if he could speak to the others, but WILSON declined to give their names to CW-1, claiming that they would be jealous if they knew they would have to share business with CW-1.

37. WILSON requested CW-1 set up an email account at Protonmail ("Proton").  WILSON had a Proton account – must1989@protonmail.com – and told CW-1 that their correspondence would be encrypted if they both used the system.  WILSON said it would be best to have the added secrecy because it would be bad if OE3 learned that they were still doing business with OST.

38. I am aware from training and experience that Proton is an encrypted email service. According to Proton's website, its servers are located in Switzerland, which has "strict […]

privacy laws."

39. CW-1 said he created RAMY and began doing business as a broker between OE3 and OST. He described the process for providing equipment to OE3. A request would come from OE3's IT department. CW-1 would contact WILSON, who would instruct CW-1 how much of a mark-up RAMY should charge to OE3. CW-1 would send an estimate to OE3's IT department, which would issue a purchase order. OST would email an invoice using ostmain@gmail.com to CW-1, who would apply the mark-up and then issue an invoice from RAMY to OE3. When paid by OE3, CW-1 would mail a check to OST's Wyoming address.

40. Other than sending checks, CW-1 told me WILSON handled almost all other communications with OST. WILSON said he would take care of telling OST what equipment was needed. CW-1 never saw the equipment purchased by OE3, and he had no way to track what was delivered.

41. CW-1 said he directly corresponded with OST by email at ostmain@gmail.com. CW-1 believed that OST's representative was "John Lasson." CW-1 tried to call him once, but his call went to voicemail. "Lasson" responded by email. "Lasson" typically emailed CW-1 when RAMY was slow in passing along payments from OE3 to OST. CW-1 said he did not know "Lasson" was an alias for WILSON or that his friend was the sender of emails from ostmain@gmail.com.

42. When emails from "Lasson" failed to make CW-1 move faster in paying OST, WILSON openly hassled CW-1. For instance, in an email from WILSON, dated June 13, 2017, WILSON wrote (in part):

> "[CW-1], I contacted them (OST), attempting to defend you, and refute the
> number of payments not made . . . if I loose [sic] this vendor a big problem
> will emerge that could directly effect [sic] my employment status because we
> are in the middle of some projects and I may not be able to get the equipment I

need in time, so I need you to pay them for the overdue invoices . . .”

43. In the interview, agents asked CW-1 about the payments from RAMY to WILSON's family. He said they were linked to a scanning project for OE3. WILSON told CW-1 that OE3 needed to migrate to digital records, and this would require individuals to do scanning work. WILSON wanted his spouse, his daughters, and some friends to do the scanning, but he said OE3 had an "anti-nepotism" policy that made it impossible to directly hire his family. To evade the anti-nepotism policy, WILSON asked CW-1 to hire his family, and they would do the scanning and then bill for their labor through RAMY. CW-1 agreed.

44. I am aware from review of OE3's nepotism policy – as noted above – that WILSON was not allowed to use his spouse and children as contractors for OE3.

45. One of the employees of OE3 I interviewed was a former member of WILSON's staff with the initials F.D. F.D. told me the IT department was struggling to digitize old paper records. F.D. performed an audit of a small portion of the scanned documents and discovered many problems. F.D. offered to perform a more thorough audit, but WILSON said he wanted to hire an outside contractor for the scanning project. WILSON later told F.D. he had found a contractor in Sacramento for the work. F.D. offered to train the contractor, but WILSON said he would handle it. WILSON never indicated his spouse and children, who lived with him in Tracy, California, were performing the work.

46. Like the OST transactions, CW-1 said nearly all of his communications about the scanning project were with WILSON. He would receive emails telling him how many hours had been worked. When WILSON's daughters' time sheets to RAMY repeatedly showed them working 60 hours a week while they were in school, CW-1 expressed concern to WILSON. WILSON admitted they were not working 60 hours a week during the school year, but he said

they had worked more than 60 hours a week during the summer.  As no one from OE3 complained about their work product, CW-1 assumed the union was satisfied.  When RAMY received payments related to the scanning project, CW-1 mailed checks to WILSON's family members.

47. CW-1 told me he called WILSON after learning of WILSON's firing by OE3.  WILSON said he had been fired because the union had discovered that he continued to do business with OST.  WILSON cautioned CW-1 against telling anyone that WILSON had a role in setting RAMY's prices.

48. After CW-1 discovered he (along with WILSON) was named as a defendant in OE3's civil action, he spoke with WILSON again.  CW-1 suggested WILSON ask "John Lasson" and OST to come to their defense, as the lawsuit alleged "Lasson" was an alias of WILSON.  WILSON said he did not think OST would help him.  CW-1 and WILSON have not spoken since then.

49. OE3 provided me with its internal records for paying RAMY.  Like the earlier transactions with OST, the RAMY deals showed WILSON as IT Director requested the payments to the vendor.  Some of the transactions showed WILSON was also an approver of paying RAMY's invoices.

50. The records from OE3 showed continued billing for services that were never delivered. Like OST in 2012–2013, RAMY billed OE3 for anti-virus software from vendor Microsoft and virtual machine programming from vendor VMware that was never delivered.  Like OST, RAMY billed OE3 for consulting work that CW-1 never provided.

- TECHNICAL SOLUTIONS OPERATIONS

51.  Although I reviewed state records online, I was not able to find evidence of

incorporation for Technical Solutions, however, Santa Clara County records show CW-2 registered Technical Solutions as a fictitious business name on January 14, 2014.

52. The FBI forensic accountant reviewed the bank statements for Technical Solutions and informed me the company received approximately $2,950,000 from OE3 from 2014 through 2017.  Substantially all of Technical Solution's income was attributed to checks from OE3.

53. The FBI forensic accountant tracked Technical Solutions' outflow.  He created categories for the four largest expenditures.  They were:

> a.  Payments to IT contractors to upgrade OE3's systems.  These checks totaled approximately $913,000.
>
> b.  Withdrawals of cash.  The amount of currency withdrawn by CW-2 was around $726,000.
>
> c.  Payment of taxes.  Technical Solutions paid over $708,000 in income tax.
>
> d.  Checks to OST.  CW-2 paid over $586,000 to OST.

54. I participated in the interview of CW-2 on January 8, 2019, pursuant to a proffer agreement.  Based on the information provided by CW-2, I believe WILSON also hid key elements of the scheme from his relative, CW-2.  On the other hand, as will be seen below, CW-2 admitted knowing WILSON was misusing his position of trust, and CW-2 engaged in paying kickbacks to WILSON as part of the scheme.

55. CW-2 resides in Santa Clara County, California, and until recently performed logistics work for a tech company.  Sometime in 2013, WILSON proposed CW-2 become a vendor for OE3.  WILSON said his favorite parts supplier – OST – was viewed in the union as doing too much business with OE3.  CW-2 told me WILSON proposed CW-2 act as a reseller of parts provided by OST.

56. According to CW-2, WILSON said his point of contact at OST would be "John Lasson." "Lasson" communicated with CW-2 by email at ostmain@gmail.com, but never in person or by phone.

57. As described by CW-2, the procedures for Technical Solutions were the same as the procedures described by CW-1 for RAMY.  WILSON would tell CW-2 how much CW-2 should mark-up the price as a reseller of equipment provided by OST.  CW-2 never saw the equipment, nor did he know whether OE3 received it.  For equipment sales, CW-2 stated that Technical Solutions only role was to act as a middleman in the billing process.

58. During the interview with agents, CW-2 stated that WILSON communicated with him in phone calls, text messages, and Proton email accounts.  At WILSON's request, CW-2 created and used a Proton email account so their correspondence would be encrypted.  WILSON used the system to tell CW-2 how much of a mark-up should be used for items billed to OE3.

59. CW-2 noticed that the prices charged by OST were sometimes higher than market price. CW-2 proposed to WILSON that CW-2 shop around for a cheaper provider of equipment. WILSON discouraged this idea.

60. Aside from being a broker between OE3 and OST, WILSON also wanted CW-2 to serve as a recruiter and paymaster for contractors hired to perform actual work on an IT project at OE3.  As understood by CW-2, WILSON needed contractors to help with upgrading the IT infrastructure.  WILSON wanted CW-2 to send resumés to WILSON.  CW-2 did not participate in interviewing prospects.  When a contractor was hired by OE3, CW-2 would bill OE3 for their hours worked, be paid by OE3, and then pass the payments to the contractors.  Over the span of several years, CW-2 recruited eight contractors for OE3.

61. When CW-2 submitted his first invoice to OE3 on behalf of the contractors, WILSON

called him and told him to modify it.  WILSON directed CW-2 to make every invoice for $40,000, even though the actual amount owed for the hours worked by the contractors was much less.

62. The inflation of the invoice for the contractors generated significant profit for Technical Solutions.  Around the time CW-2 submitted his second $40,000 invoice, WILSON contacted him again.  WILSON said he wanted 50% of the pre-tax profit from Technical Solutions. WILSON described it to CW-2 as a "kickback."

63. CW-2 told me he was unaware that the funds he passed to OST were going to WILSON, or that WILSON owned and controlled OST and used "John Lasson" as an alias.  CW-2 acknowledged, however, that he understood he was participating in an illegal scheme when he agreed to pass "kickbacks" to WILSON.

64. CW-2 described how WILSON wanted to be paid.  CW-2 withdrew large amounts of cash from his Technical Solutions' bank account.  He wrapped the cash in the shape of bricks and put the cash in silver bags.  He would then meet WILSON at restaurants in between Alameda and San Jose.  During their meetings, CW-2 would slide the bag of wrapped cash to WILSON.  Hundreds of thousands of dollars withdrawn from CW-2's business account were passed to WILSON in this manner.

65. Like CW-1, CW-2 also paid WILSON's spouse and daughters for work they supposedly did in a scanning project.  CW-2 doubted they were doing legitimate work.  On one occasion, CW-2 spoke with one of WILSON's daughters about a check he had sent to her for the project. When WILSON's daughter seemed to have no knowledge about the check, CW-2 suspected WILSON was simply taking the payments himself.

- <u>FAKE CONTRACT AND DISCOVERY OF THE SCHEME</u>

66. I participated in the interview of OE3 Finance Director with initials A.R.  A.R. told me OE3's outside auditor flagged the money paid to Technical Solutions during an audit.  Among its concerns was the lack of a contract between OE3 and Technical Solutions.  A.R. told me that WILSON suddenly produced a contract and said it had been lost in his office.  According to A.R., this probably delayed the discovery of WILSON's scheme by approximately six months.

67. According to CW-2, WILSON used Proton email to ask CW-2 to sign and backdate a contract between Technical Solutions and OE3.  I have compared the backdated contract emailed between WILSON and CW-2.  It appears to be the same as the one WILSON claimed he had lost in his office.

68. A.R. told me she eventually learned of WILSON's link to OST, which led to the end of the scheme.  Specifically, she heard WILSON had built a home in Texas, which violated union rules since the IT Director had no authority to telework.  A.R. conducted an internet search of WILSON's home of record in Tracy, California and found out that WILSON had sold it.  She also noticed that the company OST was affiliated with WILSON's former Tracy address.  A.R. recalled OST had been a vendor of OE3.  This finding led to an internal investigation and the firing of WILSON and other members of his IT staff.  It also led to OE3 cutting its ties to RAMY and Technical Solutions.

69. A.R. told me OE3 typically mails checks to vendors using the United States Postal Service.  In unusual circumstances when a check needs to be rushed, OE3 sometimes sends checks via United Parcel Service.

70. In June 2015, WILSON purchased the land where he would build his waterfront house in Texas, which is the real property commonly known as 2214 Lakeview Landing, Corsicana, Texas 75109.  He bought the lot using a single wire in the amount of $266,805.41 drawn from

his Wells Fargo Bank OST account.  Beginning in June 2016 through October 2017, WILSON paid for the construction of the house using funds from multiple sources, including "kickback" cash provided by CW-2 (as noted above), his OST account containing proceeds of the fraud, and other personal bank accounts containing proceeds co-mingled with funds from other sources.

71. Photos of property at 2214 Lakeview Landing, including views from the front of the house and the approach from the lake, are reproduced below.





## V. **SUBSEQUENT STATEMENTS BY WILSON TO CONCEAL THE SCHEME**

72. On August 15, 2018, OE3 filed a civil complaint against WILSON, his spouse, CW-1, CW-2, OST, RAMY, Technical Solutions, and former members of WILSON's IT staff.  The action makes civil fraud allegations against the defendants.  OE3 seeks damages of approximately $4.5 million.  The action was filed in the Northern District of California (Oakland Division), and is being heard by Senior District Court Judge Saundra Brown Armstrong, case number 18-cv-04989-SBA.

73. On November 14, 2018, WILSON and his spouse filed a Chapter 13 bankruptcy petition in the Northern District of Texas (Dallas Division).  The Chapter 13 Trustee assigned to the matter was Tom Powers.

74.  On August 12, 2019, Trustee Powers made a bankruptcy fraud criminal referral, alleging that WILSON "made material false statements on [his] Original and Amended Bankruptcy Schedules and Statement of Financial Affairs, at creditors' meetings and in a Rule 2004 examination (deposition), in an attempt to conceal ownership of and connections to Office Solutions, an entity which paid the Wilsons hundreds of thousands of dollars."

75. In the bankruptcy proceeding, WILSON laid out a story explaining why he disassociated

himself from OST.  He claimed in two examinations that: a) he was not in control of OST, and b) he was a victim of extortion amounting to a form of duress by the individuals who actually controlled OST.

76. A summary of the relevant statements provided by WILSON, under oath, in direct and cross-examination, follow:

    a.  Around 2011, WILSON claimed that he was walking down a street in San Jose and witnessed a bloody assault or murder.  One of the "bad individuals" threatened him with a gun, looked through WILSON's wallet to identify him, and then warned him not to say anything.  WILSON did not file a police report.

    b.  In the years since this encounter, WILSON claimed that the unidentified thugs occasionally approached him.  Examples of the contacts include coercing him into their car while he was in a parking lot, coming up to him on a walk near his house, chatting with him on a computer, and forcing him off a road while he was driving in Texas.  They were unidentifiable, except they were men, mostly white, and some had accents.  The thugs forced him to hand over cash and sports memorabilia worth hundreds of thousands of dollars.  They also made him do things like assemble furniture, which he would leave outside his house for them to retrieve.

    c.  WILSON claimed that the "thugs" forced him to sign documents and checks for OST.  On one instance, they kidnapped him and drove him to an industrial area over an hour away to sign incorporation or bank documents.  He had nothing to do with the creation or operation of OST except under duress.  The thugs made him use OST as a parts supplier for OE3.

d.  WILSON denied using the email address ostmain@gmail.com and claimed that he did not use the name "John Lasson" as an alias.  WILSON admitted, however, that he used a Proton mail address.

e.  While WILSON reported the income for OST in his tax returns, he asserted that he did so at the direction of the thugs.  Before he filed his taxes electronically, WILSON would give the thugs remote control over his computer so they could enter the information about OST in his returns.

f.  Although WILSON claimed that the thugs stole hundreds of thousands of dollars from him, according to WILSON, they also gave him hundreds of thousands of dollars from OST's bank account.  For instance, according to WILSON, they transferred funds into his account to help him pay the taxes for OST.  Also according to WILSON, they gave him a check for $250,000 drawn from the OST account, made out to the seller of the lot in Texas where WILSON would build his house.  Other expenses WILSON claimed were paid by the thugs included purchasing a used car for one of WILSON's daughters, paying credit card debts, and paying WILSON's builder in Texas.  According to WILSON, the thugs did not explain their generosity, and WILSON did not know why they helped him financially after stealing from him.

g.  WILSON claimed that the thugs warned him not to divulge their relationship with him, and he said nothing about it to anyone until 2018.  WILSON also claimed that the thugs threatened to kill WILSON's spouse and daughters if he was not compliant with their demands, though WILSON admitted he did not warn or take any action to protect his family, other than by complying with the thugs'

19

demands.

h.  WILSON claimed that the reason that he directed his mother and sister to buy
    computer equipment from OST was because he believed their prices were fair,
    and to curry favor with the thugs.

77. Based on my training and experience, and my knowledge about this case, I believe that
many of WILSON's claims and excuses listed above are false and fabricated.  WILSON's
statements in bankruptcy proceedings are logically inconsistent.  For example, according to
WILSON, the supposed "thugs" created OST to defraud the union, and then – according to
Wilson – charged fair prices to the union.  As a further example, the supposed "thugs" were
diligent about paying WILSON's and OST's taxes, and did so by importing numbers into
Wilson's online tax program.  Likewise the "thugs" purportedly stole from WILSON but also
paid for WILSON's home in Texas, and bought a car for WILSON's daughter.

78. Agents investigating this case found additional evidence indicating that WILSON's
claims are false.  For instance, although WILSON denied using ostmain@gmail.com or the alias
"John Lasson," I have reviewed records provided by AT&T and Google, for Internet Protocol
("IP") records that show this claim was false.  According to the records, from approximately July
15, 2017 to September 21, 2017 the IP address 104.178.104.185 was used to send at least 60
pieces of correspondence through the ostmain@gmail.com email account, the email account
OST and/or "John Lasson" used to communicate to vendors and OE3 IT staff.   According to the
records, IP address 104.178.104.185 has been the stationary IP address used at WILSON's
residence in Texas since June 22, 2017.  Consequently, either WILSON or someone else residing
in his home was sending correspondence using the alias "John Lasson" and doing business as
OST, which WILSON owned.  Moreover, financial investigation to date reveals that WILSON

paid for his home in Texas through the funds he stole from OE3.

79. Information provided by CW-1 and CW-2, described herein, further undermines WILSON's effort to deny engaging in a scheme against OE3. According to CW-1 and CW-2, WILSON never described activities or involvement of any "thugs" with regard to OST and WILSON's activities.

80. Additional evidence corroborates the statements of CW-1 and CW-2. For instance, CW-2 told me he paid kickbacks to WILSON in the form of cash wrapped in silver bags with yellow tape on the bags. CW-2 provided me with unused silver bags identical to the ones given to WILSON. Photos of the bags and tape provided by CW-2 are reproduced below:





81. On April 22, 2020, I received an email from WILSON's homebuilder in Texas. The email contained an image of a wrapper and tape that appears to be identical to the silver bags and tape provided to me by CW-2. According to a proffer by the homebuilder's attorney, WILSON paid for part of the house with cash wrapped in the silver bags. The image of the bags that I received from WILSON's homebuilder is reproduced below:



## VI. PROBABLE CAUSE AND CRIMINAL VIOLATIONS

82.  The mail fraud statute, Title 18, United States Code, Section 1341, provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises  . . .  for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

83.  Title 18, United States Code, Section 981(a)(1)(C), in conjunction with Title 28, United

States Code, Section 2461(c), provides, in relevant part, for the criminal forfeiture of any

23

property, real or personal, which constitutes or derives from proceeds traceable to any offense

constituting a specified unlawful activity, including mail and wire fraud.

84.  There is probable cause to believe WILSON violated 18 U.S.C. § 1341.  Specifically,

there is probable cause to believe that WILSON devised and executed a scheme and artifice to

defraud and to obtain money by false and fraudulent pretenses and representations from his

employer OE3; that the statements made and facts omitted were material; and that WILSON

acted with intent to defraud OE3.  There is also probable cause to believe that WILSON also

caused mailings, using the United States Postal Service or another interstate common carrier, to

be made to carry out an essential part of the scheme.  These mailings include the following:

| DATE (on or about) | SENDER / RECEIVER | CONTENT |
| --- | --- | --- |
| 12/05/2015 | OE3 in Alameda, California, to RAMY Enterprises, LLC in Charlotte, North Carolina | Check from OE3 to RAMY for $7647.40, including $6795.00 for Microsoft anti-virus software, invoice approved by WILSON |
| 12/16/2015 | OE3 in Alameda, California, to RAMY Enterprises, LLC in Charlotte, North Carolina | Check from OE3 to RAMY for $46,354.74, including $42,568.50 for VMware processor and version 5 server, invoice approved by WILSON |
| 12/27/2016 | OE3 in Alameda, California, to RAMY Enterprises, LLC in Charlotte, North Carolina | Check from OE3 to RAMY for $83,134.05, including $53,872.03 for VMware processor and version 5 server, and $6795.00 for Microsoft anti-virus software, both invoices approved by WILSON |

85. There is probable cause to believe that the real property commonly known as 2214

Lakeview Landing, Corsicana, Texas 75109 was mostly paid for through the proceeds of

WILSON's mail fraud activity, and is thus subject to forfeiture pursuant to 18 U.S.C.

§ 981(a)(1)(C) and 28 U.S.C. § 2461(c).

86. Financial investigation has traced the majority of the funds WILSON used to purchase

and improve the real property to the proceeds of the mail fraud activity.

## VII.    <u>CONCLUSION</u>

87.  Based on the foregoing, there is probable cause to believe that Scott A. WILSON

engaged in a scheme to defraud OE3 in violation of 18 U.S.C. § 1341, and that the real property

commonly known as 2214 Lakeview Landing, Corsicana, Texas 75109 is subject to forfeiture

pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).


Under penalty of perjury, I swear the above is true and correct to the best of my knowledge.


/s/
_____
Steven C. Coffin
Special Agent
Federal Bureau of Investigation

SUBSCRIBED AND SWORN  over the telephone per Rule 4.1
~~BEFORE ME~~ THIS 27th DAY OF MAY, 2020


_____
THE HONORABLE ~~DONNA M. RYU~~  Thomas S. Hixson
UNITED STATES MAGISTRATE JUDGE